Good morning. I'd like to, my name is Dan Fjelstad, representing the appellant here, Jay Morrissey. I would like to reserve two minutes if possible. You have a clock. What is that, Your Honor? You have a clock in front of you, and whenever you sit down, that clock will freeze, and whatever time is left on that clock will be all yours to use in rebuttal, even if it's only zero. Thank you, Your Honor. In reviewing my brief, I noted some typographical errors. That should not have happened, and I apologize. The critical inquiry in this case is whether Mr. Morrissey evidenced medical improvement on January 22, 1998. By regulation, the Secretary may find medical improvement only if there has been a decrease in the medical severity of a claimant's impairment. The Secretary must determine that the decrease is based on signs, symptoms, and laboratory findings associated with the claimant's impairment. Only after finding medical improvement is the Secretary supposed to look at the issue of employability in general. Once a claimant has been determined to be disabled, there arises a presumption of continuing disability, and the Secretary has the burden of rebutting this presumption. At the present level of review, a determination that a claimant has medically improved and disability has ceased must be supported by substantial evidence. In this particular case, substantial evidence does not support the Secretary's determination that benefits should be terminated. There is simply not adequate evidence that Mr. Morrissey's disabling conditions had improved as of January 22, 1998. Indeed, in sifting through this record, it's difficult to find any evidence at all of such improvement. In this particular case, Mr. Morrissey's disabling conditions had improved as of January 22, 1998. Indeed, in sifting through this record, it's difficult to find any evidence at all of such improvement. Why isn't what she lists at page 13, I'm sorry, it's page 3 and 4 of her order, page 13 and 14 of the base stamp. It must be the excerpt of the record. She is offering certainly deference to the ALJ, but what the ALJ in his own opinion states is evidence for the improvement. He offers simply. Well, she said it was so finely referred to in the January 22, 1998 opinion of Dr. James E. Moore that plaintiffs could perform light-duty work activities. And then she refers to the vocational expert who indicated plaintiffs' activities are consistent with light exertion activities, and while claimant has apparently made the lifestyle choice not to work since January 22, 1998, the medical evidence in the record reveals no medical reason to report claimant's decision not to work, citing TR 25. The problem with the district court's opinion is the lack of specificity here. The district court refers to inter alia the January 22, 1998 opinion of Dr. James E. Moore. In fact, the ALJ refers only to that January 22, 1998 opinion. In supporting his own decision, the ALJ does not. Does not refer to the vocational expert? He refers, but the problem is that the ALJ has turned the appropriate inquiry on its head. He goes to the vocational expert who testified at the hearing. He goes to his testimony first. When the regulations provide that in determining if you're going to terminate benefits due to medical improvement, you have to have evidence, first of all, of medical improvement. Then you look at vocational issues. There is simply no evidence in this record of a medical improvement. And what I'd like to do is go, because it's January 20th. What do you do with Dr. Moore's statement that says he's capable as of that time in 1998 of performing work? You're saying there's no medical evidence, but we do have the cited statement by Dr. Moore. Isn't that evidence? Well, I'd like to read that, because it is a critical part of this record. Here's the bulk of what Dr. Moore, and who's a psychologist, by the way? He's a psychologist participating in the care of Mr. Morrissey at a pain management treatment program, which brings together health care providers from a variety of disciplines. Again, he's a psychologist, and he says, I spent a good part of today's session talking with him about his recent neuropsychological testing that reveals significant short-term memory problems as well as some educational deficits and also some attentional difficulties. I indicated that I thought this would pose a significant barrier to many types of retraining programs and career options. I tried to reassure him, however, that there would be a number of things that he could do. We talked about doing some type of job that was fairly repetitive and that would involve him working on something that was in front of him requiring limited memory skills. This would include jobs such as some type of production work or assembly or repair work. We also talked about being a custodian or security guard, and he was open to both of those possibilities as well. He seems reasonably open to any alternatives that are fairly light duty. At best, I think that's somewhat ambiguous about, as I read it, Dr. Moore is, in the course of this treatment program, is saying, look, we're going to work towards some goals here, but a psychologist is frankly not in a position to say what his physical capacities are such that he could return to light duty work. Intellingly, there is an obligation here, of course, to look at the record as a whole. Just three days, four days later on January 26th, Dr. Moore says concerning Mr. Morrissey, he says he comes in today looking terrible. He is agitated and depressed. And at that time, in fact, they suspended Mr. Morrissey temporarily from the program because he was having psychiatric difficulties. Magistrate Judge Benton, who initially recommended reversal of the secretary's termination, the ALJ points to no specific evidence in the record of medical improvement of plaintiff's affective disorder or low back pain substantiated by changes in signs, symptoms, or lab findings, which took place on January 23, 1998, sufficient to support a conclusion that disability had ceased. And I think she's correct. What we can't see in this statement, January 22, 1998, from Dr. Moore, is any reference to an improvement in Mr. Morrissey's back condition. There's also no reference to even an improvement in his psychiatric condition, which he would have been competent, certainly, to address. And indeed, when we look at his statement of a mere four days later, he appears to be, Mr. Morrissey seems to be getting worse. When Mr. Morrissey was discharged from this pain management program in June of 1998, Dr. Moore signed off on the discharge paper, which said that he was going to need, quote, a great deal in the way of assistance, end quote, to ever return to work. And later in that year, we find references in the medical records to Mr. Morrissey having trouble figuring out a bus schedule and a vocational counselor saying that she didn't believe he was able to complete a job application. The evidence of any medical improvement in either the back or the psychiatric conditions in this case as of January 22, 1998, is simply absent. I'm going to preserve the rest of my time. Thank you. Thank you. Thank you from the government. May it please the Court. My name is Terry Shea. I'm appearing for the Commissioner of Social Security. Obviously, our take on the evidence is a little different. We think that, and the plaintiff acknowledged in his brief that the ALJ made a fair statement of the medical facts. And over the course of this gentleman's case, he was hurt in 1992. Counsel, I have something you might be able to help me with. Okay. The ALJ says he's still disabled on January 21, 1998. And somehow on the 22nd, he becomes undisabled, although there's a presumption that it would continue. What's concerning me is as I look at this record, I look back, say, at January 13, and it says this guy is not functioning anywhere close to normal. And I look at the 20th, the same guy. Moore is talking about him in general ways. We get to the 22nd, and we have this interesting statement about him, which isn't exactly a finding. You can go to work. It's Moore trying to say, hey, guy, maybe you could do light work. And that's the day we pluck out and say, okay, now he's okay. From the 21st to the 22nd, he became okay. But then you go on to the next days, the next few days, and he looks just as messed up as ever. At least he looks as messed up as he did before the 22nd. He may not look worse, but he looks the same. So the problem I'm having is how does one legally make this kind of determination? You've got him before. You've got him after. But here on the 22nd, it looks like maybe he's okay, and so he's okay? Okay. How do you deal with that? Well, our way of dealing with it would be to urge you to look at the course of treatment and the assessments by the doctors all along the way. They started indicating medical improvement as early as 1997, at least physically. They said he continued with exaggerated pain complaints and antelogic gait, despite ridiculous symptom improvement and ridiculous symptomatology of his back. But he's still no good on the 21st. Well, okay. By the improvement, he's still disabled on the 21st. That's what I'm having trouble with. I realize that people have to draw lines. Well, and that's what we're saying is that he's drawing the line. He's taking the culmination of all these assessments of the back surgeon and the psychiatrist have considerable disagreement over the way as to how much this, the psychological problem is really the main problem and how much of that is volitional or really based on his psychiatric impairment. You know, this went back and forth. Treating Dr. McConnell eventually said that there's no psychiatric problem. Standing in the way of employment, treating Dr. Swanky had the opposite take. Dr. Simpson, who was one of the consults, basically said there's a big psychological overlay. When we get into January of 1998, the only real change here is that at this point, you know, we apply a psychologist for rehab because his main problem was considered to be psychological by his back surgery. He's saying, okay, we have to recognize that this is a psychological impairment as opposed to a continuing back problem. So we have to acknowledge that and treat him. His rehabilitation counseling has to have the psychiatric element. So basically, Dr. Moore was part of a team at Virginia Mason that included the physical therapy group, that included people who were working on him with the physical straightening of his back, and Dr. Moore was the one who was working directly with the counseling. He talked to the patient and the patient said, yeah, I think I can do those kinds of jobs. And within a few days, the psychiatric profile did seem to worsen, but Dr. Moore also noted this happened at the same time he stopped taking his meds. So, I mean, again, there's the volitional, there's antidepressant medications. Basically, it's just the idea that a lot of this is volitional, that it could be controlled. If he stayed on his meds, he even himself acknowledged that he could probably return to some type of work. And that's why I think the ALJ drew the line there. While he pointed to the one report, the whole weight of the evidence from 1997 forward indicates slow but steady physical and mental improvement. The ALJ sort of says, well, what the heck, I could choose the 10th of January. I could choose the 10th of January. I could choose the 22nd of January. He based it on a strong statement. I'm sorry. I mean, is that right? I mean, I could choose any one of these dates, but, you know, anyone would do, I've got to choose a date, so I'll choose the 22nd. It just happens to coincide with Moore's report. But he decided to choose that date. Well, I think he decided to choose that date based on Dr. Moore's report being dated that date. But, again, a few days later on the 29th, Dr. Moore and the rehabilitation pain management rounds met again and said, okay, he's not with us right now because he stopped his medications. But we as a group think he can do basic work activities that didn't involve a lot of mental. Somebody required to take medication. I mean, if somebody has a condition that would be improved with medication, high blood pressure, something that we know, if you just take your meds, it gets better. Well, you know, it affects. Are they required to? Well, we can't require anybody to do anything like that, but it can affect their eligibility for benefits. If taking the medication can be shown to improve their condition such that they could work. We won't ever require surgery, but things like taking medications is something that can reasonably be held to be volitional or not, especially if it's been shown, as it was in this case, to improve his ability to work. His own treating psychiatrist, Dr. McConnell, said he thought he could return to work. I'm sorry. Are you for that? For? Proposition that somebody is disabled could be, if taking medicine, could get into a condition where they're able to work. There is authority for that. They say, I don't like to take medicine. Well, if you said something like that, you know, if there's a reasonable excuse for not taking the medication. I don't like to take medicine. We won't hold them to it. But basically. I mean, somebody just said I don't like to take medicine. Well. It's not a religious thing. It's a personal thing. And I realize it's not in this case. Yeah. Although one of the pervasive problems, as you know, with people with depression is they don't take their meds. You have to slip their lithium into their tea or something. Sure. Well, a lot of. Right. A lot of that's in a lot of not maybe this case, but a lot of cases, that's certainly a recurrent theme that people with certain types of mental impairments don't like to lose the buzz. They don't like to feel like they're wrapped in cotton, whatever the effect of the medications is. You know, they might be mentally impaired and won't take the medicine because I think the mental impairment is interfering with. OK. And I think the problem is that you should take your medicine to get better. And I think the problem in this case is the. Oh, you know, the inference of that it was volitional. There's a clear, clear thing here that this was malingering. It was like Dr. VandenBelt did say that there's malingering going on. Well, that's really the bottom. There isn't a clear statement of that. But that is part of the mix. That is part of the records in assessing whether or not he was medically improved. The ALJ made a decision or a finding that there was medical improvement as of a certain date. But basically, this is after setting out all of these different records that showed the medical improvement. It showed the varying assessments by the different psychiatrists and psychologists who assessed this claimant as it went along. And, you know, one of the doctors at certain points in time said he definitely couldn't work. At other points in time said, well, he wants to appear disabled. And we don't know if it's his personality disorder, his learned helplessness or secondary gain issue. But that's all, you know, without actually saying malingering. I don't remember if he actually did say malingering. Secondary gain means he wants. Means, you know, he wants the money. He needs, you know, the money to live on. He'd rather not try to get back into the workforce for whatever reason. Sure. Thank you. Okay. Well, you know, to sum up, basically, we feel that medical improvement is evidence throughout the medical record from about 1997 forward. Certainly of the back impairment, the psychological evidence goes two ways. But basically, the case law says if it can be interpreted the way the ALJ interpreted it, then the Commissioner's decision should be upheld. As for the numbers of jobs, we think that that has clearly been ‑‑ I'm sorry, may I finish? I'm out of time. We think the ALJ clearly linked his decision to the V.E.'s testimony and did clearly identify significant, you know, specific jobs and significant numbers of jobs. Thank you. I believe you have something like a minute left. A minute and 30 seconds. Thank you. First of all, I would suggest that the medical record here does not show any sort of continuing pattern of improvement. At best, it shows the waxing and waning, and that's a typical pattern when you're talking about low back and psychiatric difficulties. With reference to the volitional aspect of Mr. Morrissey's psychiatric condition, which counsel referenced, it's not anything that the ALJ cited. In fact, the psychiatric reference is full of references to organic problems. They can't figure out what's wrong with him. They do know that he's had a number of concussions, for instance, over the course of his career. The record here portrays a minimally functional individual who faces substantial challenges in just meeting the most rudimentary challenges that life presents. The record does not present an individual with the skills, dependability, work record, and physical and mental capacities necessary to perform substantial gainful activity on a reasonably continuous basis. And the record most certainly does not provide substantial evidence that as of January 22, 1998, Mr. Morrissey's medical conditions, both physical and mental, had improved such that he was no longer entitled to benefits. Thank you. Thank you, counsel. This argument stands submitted.
judges: Kozinski, Fernandez, Clifton